[Cite as *State v. Berry*, 2017-Ohio-1529.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

        Plaintiff-Appellee,              :

v.                                               :

Robert A. Berry,                                 :

        Defendant-Appellant.             :

No. 16AP-659
(C.P.C. No. 14CR-6374)
&
No. 16AP-660
(C.P.C. No. 16CR-3600)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on April 25, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Yavitch & Palmer, Co., L.P.A.*, and *Jeffery A. Linn, II*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Robert A. Berry, appeals judgment entries filed in case No. 14CR-6374 and No. 16CR-3600 which sentenced him to a total combined term of imprisonment of 12 years on various charges of kidnapping, rape, and conspiracy. In all respects the judgments of the trial court is affirmed and we overrule all of Berry's assignments of error.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 4, 2014, a Franklin County Grand Jury indicted Berry in Franklin C.P. No. 14CR-6374 for two counts of rape and one count of kidnapping with an accompanying firearm specification in connection with an alleged incident between Berry and his girlfriend, J.J., on November 27, 2014. (Dec. 4, 2014 Indictment 6374.) Berry denied the charges in the indictment with a "not guilty" plea at arraignment. (Dec. 8, 2014 Plea Form.)

{¶ 3} Approximately 15 months later, on February 24, 2016, Berry, through counsel, filed a motion seeking in camera review of J.J.'s psychological records. (Feb. 24, 2016 Mot. for in Camera Review.) Berry argued that it had been J.J.'s therapist, and not J.J., who first telephoned the police that J.J. had recently been involuntarily committed for post-traumatic stress disorder, known as "PTSD", and this raised questions about J.J.'s competence to testify. *Id.* at 2-4.

{¶ 4} On March 14, 2016, the trial court held a hearing to review and discuss the charges and a potential change of plea. In the hearing, the prosecution also informed the trial court that a jailhouse informant and an undercover officer working together had obtained evidence that Berry was seeking to hire someone to make J.J. unavailable for trial. (Mar. 14, 2016 Tr. Vol. 1 at 4-7.) At this juncture, the State offered a plea deal in the instant case that would also have allowed Berry to avoid indictment on new charges. *Id.* Berry turned down the offer. *Id.* Two months later, on June 27, 2016, the trial court again held a hearing at which the State extended a second plea offer that would have avoided indictment of new charges and relieved Berry of having to register as a sex offender. (Tr. Vol. 1 at 9-12.) Berry turned down this offer as well. *Id.*

{¶ 5} Following Berry's refusal of the second plea offer, the State obtained an indictment in Franklin C.P. No. 16CR-3600 against Berry on July 1, 2016 for three counts of conspiracy—conspiracy to kidnap, conspiracy to abduct, and conspiracy to intimidate a witness. (July 1, 2016 Indictment 3600.) The State then sought to consolidate the two cases based on the notion that the offenses could properly have been joined in a single indictment. (July 7, 2016 Mot. for Joinder) In opposing the motion, Berry filed a preemptive motion to sever on July 8, 2016, arguing that unfair prejudice would result from joinder and consolidation. (July 8, 2016 Mot. to Sever.)

{¶ 6} Ten days later, on July 18, 2016, the trial court convened for jury selection and trial. At the outset, the trial court granted the motion to consolidate the two cases and joined the offenses in a single trial. (July 18, 2016 Tr. Vol. 1 at 13-15.) The trial court also declined to review J.J.'s psychological records in camera. (Tr. Vol. 1 at 15.) Thereafter, the parties began to select a jury but, by request of the parties, voir dire was not transcribed nor is it available for this appeal. (Tr. Vol. 1 at 32, 35.) The trial court recessed midway through voir dire. (Tr. Vol. 1 at 32-35.) When the parties returned from recess the following exchange occurred:

> [DEFENSE COUNSEL]: Judge, may it please the Court, before the jury is brought back in the courtroom, bring it to the Court's attention a possible challenge for cause on potential panel Juror No. 4, [Name Redacted]. If the Court would remember, she indicated that in response to [the prosecutor]'s examination that she would be biased and was not sure if she could be fair. So I would ask the Court to consider removing her for cause at this juncture.
>
> THE COURT: I will not remove her for cause at this juncture. Anything on behalf of the State?
>
> [THE PROSECUTOR]: No, Your Honor.

(Tr. Vol. 1 at 34.)

{¶ 7} Following the completion of voir dire, jury selection, and opening statements, the trial court began taking evidence on July 19, 2016. The first witness was a Columbus police officer who testified that on November 27, 2014 she was called to Hinman Avenue at around 9:30 a.m. (July 19, 2016 Tr. Vol. 1 at 67-68.) She encountered J.J. on site, visibly shaken and crying. (Tr. Vol. 1 at 69.) The officer testified that J.J. had marks on her, and though the officer's memory was not clear, she thought perhaps there was a mark on J.J.'s chin or jaw. *Id.* The officers searched the house and found nothing remarkable. (Tr. Vol. 1 at 75-77.) But the officers testified that J.J. retrieved and gave to one of the officers a gun from somewhere upstairs that was purported to have been involved in the incident. (Tr. Vol. 1 at 71-72.)

{¶ 8} J.J. then testified, stating that she was 32 and had 3 children. (Tr. Vol. 1 at 80-81.) She explained that she met Berry and dated him for a time when she was 18, but they broke up when he enlisted in the military and they did not reconnect until 2014. (Tr. Vol. 1 at 82-83.) They rekindled the relationship initially through the Internet. (Tr. Vol. 1 at 83.) Berry traveled from Tennessee to Ohio to visit J.J. on Memorial Day weekend and the two decided he should move in to J.J.'s home on East Hinman Avenue. (Tr. Vol. 1 at 86-87.) J.J. and Berry returned to Tennessee with a car and a rented truck. (Tr. Vol. 1 at 86-87, 133-34.) They spent some time with Berry's father in Tennessee, retrieved Berry's belongings, and returned to Ohio. *Id.* J.J. testified that it was not long before Berry became physically abusive. (Tr. Vol. 1 at 94.) But J.J. stated she did not report the abuse because she was scared. *Id.*

{¶ 9} J.J. testified that at around 11:30 p.m. or midnight, on November 26, 2014 (the day before Thanksgiving), Berry came home bringing dinner with him. (Tr. Vol. 1 at 98-99.) She testified that he seemed angry when he arrived and his eyes appeared glassy, as if he had been drinking. (Tr. Vol. 1 at 98-101.) The two of them began to argue and Berry pulled a handgun from the back of his pants. (Tr. Vol. 1 at 102-03.) Berry shoved the gun into J.J.'s chest, said he was going to shoot her in the heart, and told her "to get ready to orphan [her] children." (Tr. Vol. 1 at 104.) He shoved her into a corner, held the gun between her eyes, and shoved it underneath her chin and neck. (Tr. Vol. 1 at 106.) At one point, she attempted to grab the gun because it was bruising her but he warned her that if she touched it he would kill her. (Tr. Vol. 1 at 107.) J.J. also testified about some sexual remarks Berry made:

> He was telling me that I was going to give him all of the money in my bank account so that he could leave the state that much sooner, that he was going to leave me, that I wasn't going to say a fucking word about that. That I, you know, was going to stop being a fat, lazy bitch, that I was going to, you know, not say anything to him unless it was nice; and if I had nothing else to say to him other than niceness or the sound of me sucking his dick, then I was not to say a word. And if I did, he would blow my head off.

(Tr. Vol. 1 at 105-06.) She responded to Berry's behavior by agreeing with him and placating him. (Tr. Vol. 1 at 105.)

{¶ 10} Following this episode, Berry told J.J. to eat the food he had bought for her. (Tr. Vol. 1 at 107-08.) He put the gun away and sat down with her for dinner. *Id.* She shook as she ate and he rolled her chair close to his and put a hand on her leg to attempt to calm her. *Id.*

{¶ 11} After dinner, J.J. asked to be excused to do laundry. (Tr. Vol. 1 at 109.) She testified that really she just wanted to get away from him, but he followed her downstairs to the laundry area and began making more threats, this time calmly explaining that he would cut her up and spread her all over America, or eat her, or kill her children. (Tr. Vol. 1 at 109-10.) They returned to the first floor together and Berry smoked a cigarette and rambled about things that J.J. could not recall at the time of trial. (Tr. Vol. 1 at 111.) After some interval, J.J. said she wanted to go to bed and so they went upstairs to bed. (Tr. Vol.

1 at 112-13.) Upstairs, Berry left the pistol on the nightstand rather than its usual place, holstered, in the drawer. (Tr. Vol. 1 at 113-14.)

{¶ 12} Once the two were in bed, no further arguments or threats occurred. (Tr. Vol. 1 at 114.) J.J. testified that, after a time, the following exchange took place:

> A. I was laying there and he said, "I guess nothing is going to happen, huh?"
>
> And I said, "What are you talking about?"
>
> He said, "What the fuck did I tell you downstairs?"
>
> Q. Did you know what he was talking about?
>
> A. I did.
>
> Q. What was he talking about?
>
> A. The fact that he told me that I had to be nice to him and suck his dick.
>
> Q. Then what happened?
>
> A. I said, "Is that your backwards way of asking me?"
>
> And he said yes, and I agreed and did it.

(Tr. Vol. 1 at 114-15.) While the oral sex was ongoing, J.J. pushed her panties to the side and Berry inserted his fingers in her vagina. (Tr. Vol. 1 at 116.) She backed away, however because it was hurting her. *Id.* J.J. testified that throughout the night the gun remained on the night table and that whenever she moved, she sensed that he awoke and was watching her. (Tr. Vol. 1 at 116-17.)

{¶ 13} The following day she acted normally, showering and applying makeup so as not to arouse Berry's suspicion that she meant to run away. (Tr. Vol. 1 at 117-18.) Berry left the home and went to the ATM for gas money for J.J. to drive to her mother's house for Thanksgiving. (Tr. Vol. 1 at 120.) She explained that she had not yet been paid for her work before the holiday, so Berry had agreed to give her money to travel to visit her mother. *Id.* Berry returned to the house, gave her the gas money, and then left for work. (Tr. Vol. 1 at 122.) Instead of leaving for her mother's house, however, J.J. telephoned an ex-boyfriend and met him in the parking lot of a local grocery store. *Id.* She also

telephoned her therapist who, on hearing her story, notified the police. (Tr. Vol. 1 at 123.) She and the ex-boyfriend (with whom she had participated in an "on and off" relationship for about six years) returned to her house to wait for the police. (Tr. Vol. 1 at 124, 137.) After speaking with the police and being checked out at the hospital, she and her ex-boyfriend went to her mother's house for Thanksgiving. (Tr. Vol. 1 at 125-27, 141.)

{¶ 14} The nurse who examined J.J. testified next. She testified that she noted trauma to J.J.'s chin and forehead although she admitted that she saw neither visible bruising nor redness. (Tr. Vol. 1 at 169.) She noted trauma, however, because if a patient indicates pain upon being touched in a location, even if the bruise is not visible, sexual assault nursing policy is to "count it as trauma." *Id.* The nurse stated she noted a linear abrasion underneath J.J.'s chin and a circular abrasion like a loop about the size of a quarter or 50-cent piece. (Tr. Vol. 1 at 169-70.) Photographs of J.J.'s face and neck show no obvious or visible signs of bruising. (State's Exs. B3-B5.) The nurse noted no signs of vaginal trauma, but testified that this is not unusual in pre-menopausal women due to tissue elasticity. (Tr. Vol. 1 at 185-89.) She also testified that DNA samples were collected from J.J. (Tr. Vol. 1 at 175-82.)

{¶ 15} At trial, a number of stipulations and exhibits on forensic topics were entered into evidence and three scientific experts testified. The parties stipulated that the gun allegedly used by Berry was operable and that DNA was collected from both the gun and Berry. (Tr. Vol. 1 at 191; July 20, 2016 Tr. Vol. 2 at 248.) The experts testified that Berry and J.J. were both contributors to the DNA sample obtained from J.J.'s mouth and that semen was found in the oral swabs from J.J.'s mouth. (Tr. Vol. 1 at 211, 225-26.) Berry admitted in his later testimony that he and J.J. had oral sex that night (though he maintained that it was consensual and mutual). (Tr. Vol. 2 at 436-37.) Neither Berry nor J.J. could be excluded as contributors to the DNA collected from the muzzle of the firearm and J.J. admitted that she had touched the gun on prior occasions. (Tr. Vol. 1 at 103; Tr. Vol. 2 at 260-61.) The remainder of the firearm, clip and body, contained no useable DNA. (Tr. Vol. 2 at 258-59; State's Ex. F2.)

{¶ 16} In the State's case against Berry on the conspiracy charges arising from alleged jail activity (conspiracy to kidnap, conspiracy to abduct, and conspiracy to intimidate a witness), three witnesses testified: the Franklin County Sheriff's Office sergeant who supervised the investigation, the informant, and the undercover officer. The

informant testified that he overhead Berry saying to another inmate that he would like to have J.J. taken care of so she would not show up for court. (Tr. Vol. 2 at 299.) The informant assumed this meant killed and contacted the prosecutor (with whom he was already acquainted). (Tr. Vol. 2 at 299, 303.) He met with the sergeant from the Sheriff's office and agreed to wear a wired device in the waistband of his pants, preferring pants to a shirt to avoid arousing suspicion. (Tr. Vol. 2 at 273, 308-09.) But this may have caused poor recorded audio quality, even after a technician attempted to "clean up" or enhance the quality of the recording. (Tr. Vol. 2 at 276-77.) Enough of the recording was audible to discern that Berry gave the informant a detailed description of the house, neighboring houses, J.J.'s car, and the fact that the back door of the house was weak (having been kicked-in previously) and often left unlocked by J.J. (State's Ex. H at 9:24:24-9:27:15, 10:16:30-10:21:25.) Berry also said, however, "[d]on't do anything to her, just scare her. Scare her into not coming back and droppin' all the charges." *Id.* at 9:29:35-9:29:46. Berry elaborated saying that J.J. was lying and that the only reason she was doing all this is because she knew he couldn't "get to her." *Id.* at 9:33:00-9:33:32.

{¶ 17} The undercover officer in the investigation was the final prosecution witness. He testified that he played the part of Jacob Smith, "Smitty," who was supposedly a friend of the informant amenable to helping with troublesome witnesses. (Tr. Vol. 2 at 349-50.) In that guise, he met with Berry. (Tr. Vol. 2 at 356-57.) Berry was not specific as to exactly what he wanted done when he spoke to the undercover officer. He again described the house, J.J., and her car. (Tr. Vol. 2 at 360-62.) He again said he did not want her harmed but that he wanted her to "go away" or be "missing." (Tr. Vol. 2 at 358-61.) The undercover officer testified that he attempted to record the meeting but, due to a technical malfunction, he was not able. (Tr. Vol. 2 at 354-55.)

{¶ 18} Berry presented two witnesses, himself and his father. His father, Eddie Berry, testified that after his son moved in with J.J. (which happened very suddenly) his son only visited Eddie on two occasions. (Tr. Vol. 2 at 384-86, 392.) On both occasions, his son was forced to cut the visit short because J.J. was calling and texting incessantly, out of a jealous suspicion that Berry was not visiting his father but rather some other woman. (Tr. Vol. 2 at 392-403.) The second short visit between Berry and his father was on October 14. (Tr. Vol. 2 at 402.) Approximately one month later, Eddie Berry testified that he learned that J.J. had his son arrested. (Tr. Vol. 2 at 404-05.) When he went to the

house some interval after his son was arrested to retrieve his son's belongings, J.J. was not present but her ex-boyfriend was. (Tr. Vol. 2 at 405-06.)

{¶ 19}Berry was the last witness to testify. He said that he met J.J. in 1999 in Hebron, Ohio. (Tr. Vol. 2 at 411.) He broke off the relationship when the firm he was working for went bankrupt unexpectedly; he changed careers, enlisting in the United States Army. (Tr. Vol. 2 at 412.) He confirmed that he and J.J. reconnected in 2014 through the Internet and that he moved in with her after visiting for the first time on Memorial Day weekend, 2014. (Tr. Vol. 2 at 417-18.) He testified that he had abbreviated his visits with his father because of J.J.'s jealous pestering. (Tr. Vol. 2 at 421-24.) He also testified that the night before Thanksgiving he brought dinner home for himself and J.J. (Tr. Vol. 2 at 431-32.)

{¶ 20} Berry stated that two days before Thanksgiving, he and J.J. had argued about who would take the kids to J.J.'s mother's house for Thanksgiving. (Tr. Vol. 2 at 432-34.) He had to work and did not want to accompany J.J. on the long, late drive to J.J.'s mother's house. *Id.* During the confrontation he decided to end things because he was tired of fighting with J.J. all the time and told her as much. *Id.* J.J. was upset that he was leaving. (Tr. Vol. 2 at 434.)

{¶ 21}The next day (the day on which J.J. alleged the incident occurred), he packed up some of his stuff. (Tr. Vol. 2 at 434-35.) He and J.J. ate the dinner he brought home, but he ate out on the porch while she ate inside. (Tr. Vol. 2 at 435.) She watched television while he went to bed. (Tr. Vol. 2 at 435-36.) When she joined him in bed she wanted to have sex but he did not want to. (Tr. Vol. 2 at 436-37.) However, she convinced him to engage in mutual oral sex. *Id.* He denied ever bringing out the gun at any point during the night and said it was in its usual space in the nightstand drawer next to the bed. (Tr. Vol. 2 at 437-38.) He testified that he certainly would not have carried it with him in his pants as he does not have a concealed carry permit. *Id.*

{¶ 22} The next day, according to Berry, he awoke, showered, and went to work. (Tr. Vol. 2 at 443.) He finished work at 11:00 or 11:30 a.m. and returned to finish packing. *Id.* He assumed that J.J. was at her mother's house until the police knocked on the door. *Id.* The police told him J.J. had accused him of rape. (Tr. Vol. 2 at 444.) He denied the charge but told them he and J.J. had engaged in consensual oral sex and voluntarily gave the police a DNA sample. *Id.*

{¶ 23} Berry admitted to many, but not all, of the statements he made to the informant. (Tr. Vol. 2 at 462-70.) He also admitted that he wanted "Smitty" to scare J.J. into dropping the charges. (Tr. Vol. 2 at 463.) However, he insisted that he thought "Smitty" would talk to J.J. (Tr. Vol. 2 at 470.) He denied that he said he wanted her to go missing. (Tr. Vol. 2 at 475.)

{¶ 24} On July 22, 2016, after initially indicating that it could not reach a verdict on the rape charge of digital vaginal penetration, the jury convicted Berry on all counts of both indictments. (July 21, 2016 Tr. Vol. 3 at 559, 563-64.) At a sentencing hearing on August 23, 2016, the trial court merged the three conspiracy counts and sentenced Berry to 3 years on the first conspiracy count, conspiracy to kidnap (which was elected by the prosecution). (Aug. 23, 2016 Tr. Vol. 3 at 577.) A judgment entry to that effect issued on August 24 and was amended on September 28 to properly reflect the merger of all three counts. (Aug. 24, 2016 Jgmt. Entry 3600; Sept. 28, 2016 Amended Jgmt. Entry 3600.) During the sentencing hearing, the trial court sentenced Berry to 3 years on the kidnapping, a consecutive 3-year sentence on the gun specification, and 3 years each for the two rapes, to be served concurrently with each other but consecutively to the 6 years for the kidnapping and related specification. (Tr. Vol. 3 at 577-78.) The trial court entered judgment on the convictions and sentences on August 24, 2016 and, thereafter, amended the judgment on January 17, 2017, to correct a typographical error which had improperly stated that the rape counts merged. (Aug. 24, 2016 Jgmt. Entry 6374; Jan. 17, 2017 Amended Jgmt. Entry 6374.) The term of imprisonment for Franklin C.P. No. 14CR-6374 was 9 years and the total for Franklin C.P. No. 16CR-3600 was 3 years. The trial court ordered Berry to serve these sentences consecutively to each other for a total prison term of 12 years. (Amended Jgmt. Entry 3600; Amended Jgmt. Entry 6374.)

{¶ 25} Berry now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 26} Berry argues seven assignments of error for our review:

> [1.] THE TRIAL COURT ERRED BY FAILING TO MERGE THE KIDNAPPING AND THE RAPE CONVICTIONS FOR PURPOSES OF SENTENCING DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED

STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION

[2.] THE TRIAL COURT ERRED IN NOT PERMITTING DEFENSE COUNSEL TO REVIEW RECORDS *IN CAMERA* DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[3.] THE VERDICT RENDERED BY THE TRIAL COURT WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[4.] THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[5.] THE TRIAL COURT ERRED IN JOINING 14 CR 6374 AND 16 CR 3600 DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[6.] DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE OF JOINDER AT THE CLOSE OF THE STATE'S CASE OR AT THE CONCLUSION OF ALL THE EVIDENCE AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[7.] THE TRIAL COURT ERRED IN FAILING TO DISMISSED JUROR NO. 4 FOR CAUSE DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

Nos. 16AP-659 and 16AP-660

(Sic passim.)  For ease of discussion we address these out of order.

## III.  DISCUSSION

### A. Third and Fourth Assignments of Error—Whether the Convictions were Against the Manifest Weight of the Evidence or not Supported by Sufficient Evidence

{¶ 27}The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * * declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 28}  Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 29}  By contrast:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594.  In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in

resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

### 1. Conspiracy

{¶ 30} The jury rendered a verdict against Berry on three counts of conspiracy to (respectively) kidnap, abduct, and intimidate a witness. R.C. 2923.01(A); 2905.01(A); 2905.02(A)(1) and (2); 2923.31(I)(2)(a); 2923.32; 2921.04(B)(1) and (2). However, the offenses merged and the prosecution elected to convict and sentence Berry for the count of conspiracy to kidnap. (Tr. Vol. 3 at 568) (electing the conspiracy to kidnap count); *see also* R.C. 2941.25(A) (providing that in the case of merged offenses "the defendant may be convicted of only one").

{¶ 31} R.C. 2923.01 sets forth the offense of conspiracy in relevant part as:

> (A) No person, with purpose to commit or to promote or facilitate the commission of * * * kidnapping * * * shall do either of the following:
>
> (1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
>
> (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
>
> (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.
>
> * * *
>
> (D) It is no defense to a charge under this section that, in retrospect, commission of the offense that was the object of the conspiracy was impossible under the circumstances.
>
> (E) A conspiracy terminates when the offense or offenses that are its objects are committed or when it is abandoned by all conspirators. In the absence of abandonment, it is no defense

> to a charge under this section that no offense that was the object of the conspiracy was committed.

{¶ 32}  R.C. 2905.01(A)(5) sets forth kidnapping in relevant part as follows:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (5) To hinder, impede, or obstruct a function of government.

{¶ 33}  The jailhouse informant wore a wire and testified about Berry's scheme to keep J.J. from testifying.  (Tr. Vol. 2 at 273, 308-09.)  During the audio recording, Berry gave the informant a detailed description of the house, neighboring houses, J.J.'s car, and the fact that the back door was often left unlocked by J.J. and was weak, in any case, as a result of having been kicked-in previously.  (State's Ex. H at 9:24:24-9:27:15, 10:16:30-10:21:25.)  Berry was recorded as saying, "[d]on't do anything to her, just scare her.  Scare her into not coming back and droppin' all the charges."  (State's Ex. H at 9:29:35-9:29:46.)  Berry also said that the only reason J.J. was doing all this is because she knew he could not "get to her."  *Id.* at 9:33:00-9:33:32; Tr. Vol. 2 at 324.  "She knows she's lying, and me being out on the streets would scare her." (State's Ex. H at 9:33:25-9:33:32; Tr. Vol. 2 at 325.)  Berry solicited the informant's help and the help of the informant's friend, "Smitty."  (Tr. Vol. 2 at 326-28.)  The undercover officer in the investigation who played the part of "Smitty," met with Berry and testified about the meeting.  (Tr. Vol. 2 at 349-50, 356-57.)  He testified that though Berry was not specific as to exactly what he wanted done, he again described the house, J.J., and her car.  (Tr. Vol. 2 at 360-62.)  He also said that although Berry did not want J.J. harmed, he wanted her to "go away" or be "missing."  (Tr. Vol. 2 at 358-61.)

{¶ 34}  In short, Berry did not explicitly solicit either the informant or his supposed friend (the undercover agent) to use "force, threat, or deception" to remove or restrain J.J. in order to impede or obstruct his upcoming trial.  (Tr. Vol. 2 at 364-66.)  But by describing J.J., her car, the house, and particularly the weak back door, it is apparent he intended "Smitty" to use force, threat, deception, or some combination of the three to accomplish his goal; in essence, that J.J. "not com[e] back" or "go away" or be "missing,"

at the time of trial. (Tr. Vol. 2 at 358-61; State's Ex. H at 9:24:24-9:27:15, 10:16:30-10:21:25.) Berry's conviction for conspiracy to kidnap was neither against the manifest weight of the evidence nor insufficiently supported.

### 2. Kidnapping

{¶ 35}R.C. 2905.01(A)(3) sets forth kidnapping in relevant part as:

> (A) No person, by force, threat, or deception,* * * shall * * * restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (3) To terrorize * * *the victim.

{¶ 36} J.J. testified that Berry threatened her with a gun, shoving her into a corner and placing it firmly against her chest, chin, neck, and between her eyes while telling her he was going to kill her. (Tr. Vol. 1 at 104-07.) She testified that she did not feel free to leave while this was going on. (Tr. Vol. 1 at 106.) Under the circumstances, a "rational trier of fact could have found the essential elements of the crime," restraint by force or threat with purpose to terrorize, "proven beyond a reasonable doubt" from the evidence. *Monroe* at ¶ 47; R.C. 2905.01(A)(3).

{¶ 37}The only other witness to what happened that night, Berry, denies that anything at all untoward occurred. (Tr. Vol. 2 at 432-44.) He testified that he and J.J. engaged in consensual oral sex and J.J. admitted that she had touched the gun on prior occasions. (Tr. Vol. 1 at 103; Tr. Vol. 2 at 436-37.) Thus, the DNA evidence, which could not exclude either Berry or J.J. as contributors to DNA on the gun, along with the genetic material in J.J.'s mouth, is consistent both with J.J.'s statements and with Berry's version of events from that night. (Tr. Vol. 1 at 191, 211, 225-26; Tr. Vol. 2 at 248, 260-61.) J.J.'s sexual assault physical exam did not rule out the assault J.J. described, but neither did it directly produce evidence of it. (Tr. Vol. 1 at 169-70, 185-89; State's Exs. B3-B5.) We also recognize that there are certain seeming inconsistencies and quirks in J.J.'s account: (1) Berry told J.J. he would empty her bank account but then lent her gas money so she could visit her mother; (2) the police did not find the gun which was supposedly sitting in plain sight on the night stand and J.J. had to bring it to one of them; (3) after this ordeal, J.J. went not to the police but rendezvoused with an ex-boyfriend in a grocery store

parking lot, whom she later took to her mother's house for Thanksgiving; and (4) J.J. did not tell the police about the situation until her therapist had notified them. *See supra* ¶ 7, 9, 13. Nonetheless, the jury had the opportunity to evaluate both J.J. and Berry's testimony and it evidently decided to give more weight to J.J.'s testimony as more credible.

{¶ 38} Berry's attempt to have J.J. kidnapped by "Smitty," is (based upon precedent) consistent evidence of consciousness of guilt. *State v. Richey*, 64 Ohio St.3d 353, 357 (1992) (threats against witnesses can evidence consciousness of guilt). Under the circumstances, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered" concerning the kidnapping allegations. *Thompkins* at 387.

### 3. Rape

{¶ 39} R.C. 2907.02(A) sets forth the offense of rape as:

> No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

R.C. 2907.02(A)(2).

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A).

{¶ 40} It is undisputed by both Berry and J.J. that J.J. performed oral sex on Berry on the night in question. (Tr. Vol. 1 at 114-15; Tr. Vol. 2 at 436-37.) And though their testimonies differ as to exactly what happened (J.J. said fingers and Berry said oral), both agreed that Berry engaged in sexual conduct involving J.J.'s vagina. (Tr. Vol. 1 at 116; Tr. Vol. 2 at 436-37); *see also* R.C. 2907.01(A) (defining "sexual conduct" as including fellatio, cunnilingus, and "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another"). Thus, the pivotal but disputed element is force or threat of force, and the relevant question is whether it was

Nos. 16AP-659 and 16AP-660

Berry's "specific intention to" "compel[] [J.J.] to submit" to engaging in sexual conduct "by force or threat of force."  R.C. 2901.22(A); 2907.02(A)(2).

{¶ 41}J.J. testified about the oral sex and vaginal penetration as follows:

Q.  So you went up to the bedroom?

A.  Yes.

Q.  Whose idea was it to go up there?

A.  Me.

Q.  Why did you say --

A.  I wanted to go to bed.

Q.  Why?

A.  Because I just, I was exhausted. I was physically and emotionally drained.

Q.  And where was he going to sleep?

A.  I didn't care.

Q.  Okay. Well, if he was going to sleep in bed with you, how did you feel about that?

A.  I just had to make it through until I could leave.

Q.  Were you still trying to please him?

A.  Yes.

Q.  Or say what he wanted?

A.  Yes.

Q.  Did you have a cell phone?

A.  Yes.

Q.  Why didn't you call 911?

A.  Because I was told that if I threatened his freedom, he would kill me.

Q.  All right. Now, did he still have the gun?

A. Yes.

Q. When you went upstairs, what if anything did he do with the gun?

A. Set it out in plain eyesight.

Q. Where?

A. On the nightstand.

Q. In your bedroom?

A. Yes.

Q. What did you do?

A. He usually put it away. He usually had a holster for it and it went inside the drawer. This time it was different. It sat on top, out.

Q. So you knew where he normally kept it?

A. I did.

Q. And he did not do that this time?

A. No.

Q. It has [sic] out where you could see it?

A. Absolutely.

Q. On whose side of the bed?

A. His.

Q. Did the two of you go to bed?

A. Yes.

Q. Was there anymore [sic] argument, threats, anything like that when you first went to bed?

A. No.

Q. Did that change?

A. No.

Nos. 16AP-659 and 16AP-660

Q. What happened in the bed?

A. I was laying[sic] there and he said, "I guess nothing is going to happen, huh?"

And I said, "What are you talking about?"

He said, "What the fuck did I tell you downstairs?"

Q. Did you know what he was talking about?

A. I did.

Q. What was he talking about?

A. The fact that he told me that I had to be nice to him and suck his dick.

Q. Then what happened?

A. I said, "Is that your backwards way of asking me?"

And he said yes, and I agreed and did it.

Q. You did it?

A. I did.

Q. Did you feel like you had a choice?

A. No.

Q. Where was the gun?

A. It was in plain sight on the nightstand beside me -- or beside him. I mean, it was beside him on the nightstand where I could see it. I only had a queen-size bed, so it was sitting like this. So if I am on this side, he is on this side and the gun is right there.

Q. Could he easily reach it?

A. Absolutely.

Q. Did you perform oral sex on him?

A. I did.

Q. His penis was in your mouth?

> A. Absolutely.
>
> Q. And did you feel like you had a choice?
>
> A. No.
>
> Q. While that was happening did he do anything to your body?
>
> A. He was touching my body. He also put fingers in my vagina. I backed away because it was hurting because it was, you know, I wasn't excited or anything because this was not an act of sex for me. It was control and I knew that.
>
> Q. And did you want him to put his fingers inside of you?
>
> A. No, I didn't really want to touch him at all. I just didn't feel like I had a choice.
>
> Q. What kind of clothing did you have on?
>
> A. I had a bra and underwear on.
>
> Q. Did he remove any of that clothing to do that?
>
> A. No, I just pushed it to the side.
>
> Q. What about his clothing?
>
> A. He always went to bed naked.

(Tr. Vol. 1 at 112-16.)

{¶ 42} That Berry left the gun out rather than putting it away and explicitly referenced the threats about how he would blow off J.J.'s head if he heard anything from her other than "niceness or the sound of [J.J.] sucking his dick," is evidence of Berry's "specific intention to" "compel[] [J.J.] to submit" to engaging in sexual conduct "by force or threat of force." (Tr. Vol. 1 at 106, 113-15); R.C. 2901.22(A); 2907.02(A)(2). As to fellatio, " 'viewing the evidence in a light most favorable to the prosecution, a[] rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Monroe* at ¶ 47, quoting *Jenks* at paragraph two of the syllabus.

{¶ 43} As to digital vaginal penetration, the evidence was sufficient to support a second conviction of rape based on J.J.'s testimony that, as she performed fellatio, "[h]e

was touching my body." (Tr. Vol. 1 at 116.) As he was touching her body, she pushed aside her underwear and he placed his fingers in her vagina. J.J. was clear in her testimony that she did not want his fingers there. She also testified that she believed she had to comply with Berry's earlier threats and the implicit and continuing threat of his gun on the nightstand, and so she let him touch her, moving aside her underwear as she performed fellatio to avoid being hurt or killed. J.J. stated she waited for Berry to leave so that she could get away from him. Although the evidence on the digital penetration[1] could have been construed in varying ways—ultimately, it is within the province of the jury to weigh the evidence. The jury convicted him of rape for the digital penetration. The evidence was sufficient for a jury to convict Berry on this count. J.J. moved aside her underwear in complying with Berry's earlier threats and orders to keep from being hurt or killed by Berry.

{¶ 44} As for the issue of whether the jury's verdict was against the manifest weight of the evidence, the only other witness to what happened that night, Berry, denied that anything inappropriate occurred. (Tr. Vol. 2 at 432-44.) He stated that he and J.J. engaged in consensual oral sex. (Tr. Vol. 2 at 436-37.) DNA evidence was consistent with both J.J. and Berry's accounts of the events of the evening in question. (Tr. Vol. 1 at 211, 225-26.) The physical exam did not rule out a rape, but neither did it prove rape occurred. (Tr. Vol. 1 at 185-89.) There were evidentiary questions about J.J.'s testimony in support of the two counts of rape—oral and digital: (1) J.J. moved her underwear to allow Berry to access her vagina during the oral rape; (2) Berry lent J.J. gas money so she could leave and visit her mother; (3) the police did not find the gun in plain sight on the night stand (J.J. had retrieved it after their search and brought it to them); (4) J.J. went not to the police but met with an ex-boyfriend in a grocery store parking lot and then later took him to her mother's house for Thanksgiving; and (5) it was J.J.'s therapist who

---

[1] J.J. testified:

Q. What kind of clothing did you have on?

A. I had a bra and underwear on.

Q. Did he remove any of that clothing to [accomplish the digital penetration]?

A. No, I just pushed it to the side.

(Tr. Vol. 1 at 116.)

notified the police and not J.J. *See supra* ¶ 7, 9, 12-13. Nonetheless, the jury had the opportunity to consider and weigh both J.J.'s and Berry's testimony. It decided to believe J.J., finding Berry guilty of all counts of the two indictments on the greater weight of the evidence against him. Under the circumstances, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶ 45} We overrule Berry's third and fourth assignments of error.

### B. First Assignment of Error—Whether the Trial Court Erred by Failing to Merge the Kidnapping and Rape Convictions

{¶ 46} The Ohio statute on allied offenses requires:

> (A) Where the same conduct by [the] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 47} The Supreme Court instructs courts in Ohio on the interpretation and application of R.C. 2941.25:

> 1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

> 2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

> 3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the

Nos. 16AP-659 and 16AP-660

> offenses were committed separately, or (3) the conduct shows
> that the offenses were committed with separate animus.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraphs one through three of the syllabus. Whether offenses are allied offenses of similar import is reviewed de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 26-28.

{¶ 48} Berry argues that if J.J.'s testimony is to be believed, the kidnapping was just one long sexually-oriented offense and only occurred as a means to accomplish the rape. (Jan. 13, 2017 Berry Brief at 30-33.) We disagree. In the first place, Berry was indicted and convicted of kidnapping under R.C. 2905.01(A)(3) (kidnapping with purpose to terrorize) rather than R.C. 2905.01(A)(4) (kidnapping with purpose to engage in sexual activity against the victim's will). (Indictment 6374 at 1; July 22, 2016 Kidnapping Verdict.) J.J.'s testimony supports the elements of kidnapping—that Berry inflicted physical and emotional harm on her in the form of the gun being pressed to her head, heart, and between the eyes while Berry uttered deadly threats. (Tr. Vol. 1 at 101-07.) This was followed by periods of quiescence for dinner, laundry, and cigarette smoking, before Berry referenced the earlier threat in order to intimidate J.J. into having sexual relations with him. (Tr. Vol. 1 at 107-15.) J.J.'s testimony supports a determination that the "harm that result[ed]" from the physical restraint involving the gun "is separate and identifiable" from the "harm that result[ed]" from being coerced into engaging in sexual acts with Berry. *Ruff* at paragraph two of the syllabus. Moreover, being forced to perform fellatio results in "separate and identifiable" harm from being forced to allow Berry to digitally penetrate her vagina. *See State v. Nicholas*, 66 Ohio St.3d 431, 435 (1993) (holding that three rape charges arising from vaginal intercourse, cunnilingus, and digital penetration of the vagina did not merge because they were based on separate conduct). Under *Ruff*, "the conduct constitut[ing the rapes and kidnapping] offenses" resulted in "separate and identifiable" harms that were "offenses [were] of dissimilar import." *Ruff* at paragraphs two and three of the syllabus.

{¶ 49} The offenses were of dissimilar import and were not to be merged. We overrule Berry's first assignment of error.

### C. Second Assignment of Error—Whether the Trial Court Erred in Not Agreeing to Review J.J.'s Psychological Records In Camera

{¶ 50} The United States Supreme Court has explained that:

Nos. 16AP-659 and 16AP-660

> It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, [373 U.S. 83,] 87 [(1963)]. Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[evidence] is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. [667,] 682 [(1985)] (opinion of BLACKMUN, J.); *see id.*, at 685 (opinion of WHITE, J.).

*Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

{¶ 51} Based on this principle, the United States Supreme Court held that a defendant accused of raping his underage daughter had a right to have the trial judge review, in camera, the generally confidential Children and Youth Services file on the case to determine whether favorable material evidence was present. *Id.* at 58. In so doing, it rejected arguments that the defendant was not entitled to in camera review because he had not made a "particularized showing of what information he was seeking or how it would be material." *Id.* at 58, fn. 15. Requiring "particularized" arguments about the contents of records would place an unfair requirement on a party not privy to them. But the Supreme Court did recognize a need for "some plausible showing" to establish a "basis for [the] claim that [the file sought] contains material evidence." *Id.* Both the United States and Ohio Supreme Courts have held that the obligation of the prosecution to share favorable material evidence with the defense extends to information not in the actual possession of the prosecution but within the knowledge of "others acting on the government's behalf." *State v. Sanders*, 92 Ohio St.3d 245, 261 (2001), quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), citing *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir.1996).

{¶ 52} Berry's motion gave the trial court very little information. It did not explain what Berry expected or hoped to find in such records. (Mot. for in Camera Review at 2-4.) Obviously, psychiatric records could have been relevant if some plausible suspicion had been articulated that J.J.'s therapy related to a condition that could have impaired her ability to accurately recall events. Evid.R. 601(A). But the assertions in the motion instead

Nos. 16AP-659 and 16AP-660

were merely that J.J.'s therapist notified the police following the incident, that J.J. was known to take medication, and that J.J. had admitted to being involuntarily committed (possibly for PTSD) during the pendency of the case. (Mot. for in Camera Review at 2-4.) None of these assertions amounts to a "plausible showing" that the evidence sought was favorable and material to Berry's defense such that the prosecutor would have had an obligation to obtain it and surrender it to the court for inspection. *Ritchie* at 58, fn. 15. In his motion, Berry also did not identify who possessed the records that he sought to have reviewed; nor did he state that such records were within the knowledge of persons acting on the government's behalf. *Sanders* at 261. It is not clear that a *Brady* or *Ritchie* disclosure was even the proper vehicle for examining any such records (rather than, for example, a subpoena). *See, e.g.*, Crim.R. 16(E)(1); Crim.R. 17.

{¶ 53} Berry's second assignment of error is overruled.

### D. Fifth Assignment of Error—Whether the Trial Court Erred in Consolidating the Rape and Kidnapping Case with the Conspiracy Case

{¶ 54} Crim.R. 13 provides that:

> The court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information.

And Crim.R. 8(A) explains:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, * * * are based on two or more acts or transactions connected together.

But:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

Crim.R. 14. We review joinder decisions for abuse of discretion and where, as here, the opposition to joinder was not renewed at trial, for plain error. *State v. Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 36-37.

Nos. 16AP-659 and 16AP-660

{¶ 55}We find that the conduct in Berry's two cases were based on acts that were "connected together." Crim.R. 8(A). Berry would have had no need for "Smitty" to make J.J. "go away" or be "missing" if the first case had never existed. Thus the offenses could have been "charged in the same indictment, information or complaint" within the meaning of Crim.R. 8(A) and, therefore, pursuant to Crim.R. 13, the court could have properly ordered the two indictments to be tried together.

{¶ 56}However, a defendant may successfully sever even properly consolidated or joined cases pursuant to Crim.R. 14 if he can establish prejudice to his rights. *State v. Lott*, 51 Ohio St.3d 160, 163 (1990).

> In considering a criminal defendant's claim of prejudice resulting from the joinder of multiple offenses, a court must determine: "(1) whether evidence of the other crimes would be admissible even if the counts were severed; and (2) if not, whether the evidence of each crime is simple and distinct."

{¶ 57}*State v. Hall*, 10th Dist. No. 02AP-1198 (Sept. 30, 2003), quoting *State v. Thomas*, 10th Dist. No. 01AP-730 (Feb. 12, 2002); *see also State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). Because the two prongs in *Hall* and *Schaim* are conjunctive, "[i]f the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim* at 59, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964).

{¶ 58} Evidence of the underlying kidnapping and rape allegations would have been relevant and admissible in the conspiracy case to explain Berry's motive. *See* Evid.R. 404(B). Thus, with respect to that portion of the analysis, we need go no further. *Schaim* at 59. But the converse question, whether the evidence in the conspiracy case would have been properly admissible in a separate trial of the underlying kidnapping and rape charges, is a closer question and thus we find it necessary to consider both prongs of *Hall* and *Schaim*.

{¶ 59}The fact that Berry sought to silence J.J. through illegal means was evidence tending to show consciousness of guilt in the underlying kidnapping and rape case. *Richey* at 357. Though evidence of the conspiracy to make J.J. unavailable would have been relevant even in a stand alone trial for rape and kidnapping, the evidence could have

been excluded if its "probative value [were] substantially outweighed by the danger of unfair prejudice." *See* Evid.R. 403(A). The conspiracy to silence J.J. was indicative of consciousness of guilt but also theoretically consistent with a conclusion that Berry was frustrated because he believed himself falsely accused of the kidnapping and rape and he could be vulnerable to being wrongly convicted by a jury. For instance, there exists the psychological temptation to draw an impermissible inference that someone who conspires to kidnap might also commit kidnapping and rape. In *State v. Roberts*, the Supreme Court of Ohio remarked on the "tendency of some juries in complex trials not to segregate the proof required on each separate offense, but to convict for all crimes on the combined proof offered upon all offenses." 62 Ohio St.2d 170, 175 (1980). "Such convictions thus obtained, when the evidence if considered separately would be insufficient to sustain all the convictions, are improper." *Id.*

{¶ 60} However, here we do not perceive a jury would have difficulty segregating as "simple and distinct" the evidence between whether Berry kidnapped and raped J.J. and whether he conspired to silence her. *See Hall*; *Schaim* at 59. Evidence on the conspiracy was acquired more than one year after the day of the underlying kidnapping and rape. It was acquired and testified to by different witnesses. It concerned differing behavior on different days. It also concerned behavior that differed in kind and character (attempting to hire someone to make a witness unavailable as compared to a severe incident of domestic violence). This case was not especially complicated, and the evidence could easily be segregated. Thus, we hold that the trial court did not abuse its discretion or commit plain error in consolidating the two cases, joining the offenses, and thereafter failing to sever them.

{¶ 61} Berry's fifth assignment of error is overruled.

## E. Sixth Assignment of Error—Whether Trial Counsel was Constitutionally Ineffective in Failing to Renew Opposition to Joinder and Consolidation

{¶ 62} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. The failure to make either showing defeats a claim of ineffective assistance of

counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ")

**{¶ 63}** Because we found, with respect to Berry's fifth assignment of error, that the trial court did not abuse its discretion in consolidating, joining, and failing to sever the cases, we cannot find any prejudice in defense counsel's failure to renew the motion to sever during the trial. Therefore, we overrule Berry's sixth assignment of error.

### F. Seventh Assignment of Error—Whether the Trial Court Erred in Failing to Dismiss Juror Number Four

**{¶ 64}** Berry's argument to exclude juror number four relies on an exchange which occurred following a lunch recess during voir dire:

> [DEFENSE COUNSEL]: Judge, may it please the Court, before the jury is brought back in the courtroom, bring it to the Court's attention a possible challenge for cause on potential panel Juror No. 4, [Name Redacted]. If the Court would remember, she indicated that in response to [the prosecutor]'s examination that she would be biased and was not sure if she could be fair. So I would ask the Court to consider removing her for cause at this juncture.
>
> THE COURT: I will not remove her for cause at this juncture. Anything on behalf of the State?
>
> [THE PROSECUTOR]: No, Your Honor.

(Tr. Vol. 1 at 34.) Because voir dire was not transcribed, neither the question nor the juror's actual responses were preserved. (Tr. Vol. 1 at 32-35.)

**{¶ 65}**"[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial." *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, ¶ 13. Moreover, the Supreme Court of Ohio has clearly explained:

> The duty to provide a transcript for appellate review falls upon the appellant. This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record. *See State v. Skaggs* (1978), 53 Ohio St. 2d 162. This principle is recognized in App. R. 9(B), which provides, in part, that "* * * the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for

> inclusion in the record * * *." When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm.

*Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). While it is true that defense counsel offers his assertion that juror number four said she would be biased, and though it is obvious that a biased juror should be excused, "[w]e have long held that 'statements of counsel are not evidence.' " *RNG Props., Ltd. v. Summit Cty. Bd. of Revision*, 140 Ohio St.3d 455, 2014-Ohio-4036, ¶ 28, fn. 1, quoting *Corporate Exchange Bldgs. IV & V, L.P. v. Franklin Cty. Bd. of Revision*, 82 Ohio St.3d 297, 299 (1998). Thus, the record is devoid of any evidence demonstrating whether the juror was biased. Therefore, we must presume the regularity of the proceedings in the trial court and overrule this assignment of error. *State ex rel. Bardwell v. Cuyahoga Cty. Bd. of Commrs.*, 127 Ohio St.3d 202, 2010-Ohio-5073, ¶ 14.

{¶ 66} Berry's seventh assignment of error is overruled.

## IV. CONCLUSION

{¶ 67} We overrule Berry's seven assignments of error. Therefore, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

KLATT and SADLER, JJ., concur.

------------